UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MEDSCRIPT PBM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:08CV0293 AGF |
| | ) | |
| PROCARE PBM, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This diversity action is before the Court on the motion of Defendant ProCare PBM, Inc., to compel arbitration.[1] For the reasons set forth below the motion shall be granted.

**BACKGROUND**

Plaintiff MedScript PBM, Inc., is a Missouri corporation which administers prescription benefits for contracted members. Defendant, a company based in Georgia, consults on prescription benefits programs, such as Plaintiff's, offers pharmacy retail and mail service networks, and maintains a drug formulary. Effective May 1, 2003, Plaintiff and Defendant entered into a Client Service Agreement ("CSA"), pursuant to which Defendant agreed to provide certain services to Plaintiff, the client. (Pl. Ex. A.) Sections 2 and 3 of the CSA set forth Defendant's and Plaintiff's responsibilities, respectively.

---

[1] The parties have consented to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

Section 2.3 required Defendant to pay Plaintiff, on a quarterly basis, certain rebate amounts received from drug manufacturers. Section 2.10 provided, in relevant part, that "[t]o the extent required by law, upon reasonable notice and written request," Defendant would make its records pertaining "to services it provides Plaintiff" available for audit or review by an independent party representing Plaintiff. Section 4 described Plaintiff's compensation obligations for services and drug products provided by Defendant. The rate of reimbursement for brand products ("Brand Product Reimbursement Rate") was set forth in Appendix B to the CSA. In Appendix E to the CSA – "Performance Guarantees" -- Defendant offered a certain discount performance guarantee for brand products ("Brand Pricing Performance Guarantee").

>Section 7, entitled "Term & Termination," provides in relevant part, as follows:

> 7.1 *Term*: The initial term of this Agreement shall commence on May 1, 2003, and shall continue for a period of three (3) years. It shall automatically renew on the anniversary date of above for successive one (1) year terms unless written notice is provided by either party no less than ninety (90) calendar days prior to the end of such term. . . .

> 7.2 *Termination*: This Agreement may be terminated as follows:

> 7.2.1 In the event of a breach of this Agreement by either party, the other non-breaching party may terminate this Agreement upon thirty (30) days written notice to the beaching party . . . . The written notice must include the specific nature of the breach, the effective date of termination, and the conditions that must be met to cure the breach. The breaching party shall have no less than thirty (30) calendar days after receipt of the termination notification to cure the breach to the reasonable satisfaction of the non-breaching party. In the event that the breach is cured within the time afforded in the notice, the notice of breach shall be deemed as rescinded and no further action shall be required and this Agreement shall remain in force.

* * *

> 7.4 *Post-Termination*: Both parties understand and agree that following the effective date of termination of this Agreement, all obligations specified herein shall cease except any provision specifically referenced as surviving this agreement's termination. Notwithstanding any termination, Client shall remain obligated to pay ProCare for all services provided by ProCare, including but not limited to, outstanding monies due for previous invoices . . . .

Section 10 of the CSA provides that the CSA was to be governed and construed in accordance with Georgia law. Section 11, entitled "Arbitration," provides in relevant part:

> Except as specifically provided in Section 18 [Non-Competition Covenant], both parties agree to meet and confer in good faith to resolve any problems or disputes that may arise under this Agreement. Such negotiations shall be a condition precedent to the filing of any arbitration demand or any legal action of any kind by either party. Except as specifically provided in Section 18, the parties agree that any controversy or claim arising from or relating to this Agreement, or the breach thereof, whether involving a claim, contract or otherwise, shall be settled as follows:
>
> > a. In the event that a party believes that a dispute has arisen, that party shall so notify the other party. Within fifteen (15) business days of such notice, an Executive Committee composed of equal membership of ProCare and Participating Provider representatives with one senior executive from each side must meet and confer in good faith in an attempt to resolve the dispute. If the dispute is not amicably resolved within thirty (30) business days of said meeting and one party wishes to pursue the dispute, the party shall refer the dispute to binding arbitration in accordance with commercial rules established by the American Arbitration Association ("AAA"). The AAA shall administer all arbitration proceedings. However the arbitrator shall be bound by applicable state and federal law, and shall issue a written opinion setting forth findings of fact and conclusions of law. Both parties agree the decision fo the arbitrator to be final and binding.

Section 18, the non-competition covenant, provides a non-competition agreement by Defendant ProCare, applicable during the term of the Agreement and for the 12 months

3

thereafter, and specifically provides that Plaintiff MedScript shall be entitled to specific performance or injunctive relief for any breach of the covenant.

Section 17, "Severability," provides: If any section of this Agreement is found to be unenforceable, illegal, or void, then the remainder of the Agreement shall remain in full force and effect." Id.

By letter dated January 26, 2006, Plaintiff gave notice of non-renewal of the CSA, pursuant to Section 7.1, with an effective end date of April 30, 2006. By letter dated September 20, 2006, Defendant remitted payment to Plaintiff for $198,439.11 it claimed it owed Plaintiff under Section 4.5 of the CSA. Defendant also noted that Plaintiff owed Defendant $9,450, as reflected on previous invoices. Defendant added in relevant part as follows:

> The Agreement has terminated and except for those obligations which specifically and expressly survive the termination of the Agreement, all of our obligations to you, financial and otherwise, have terminated as well. Naturally, we will continue to analyze and process rebates for periods occurring prior to the termination of the Agreement and will remit to you amounts for rebates for which we are legally obligated. We will also invoice you for any trailing claims reversals.
>
> We understand that you may want to conduct some sort of rebate audit and potentially an internal audit of claims. While the Agreement does not require us to allow an audit, if you proceed with such request and an audit is ultimately performed, all claims and amounts, favorable or unfavorable, eligible or not, identified during any such audit performed by you or by us will be subject to adjustment.

(Pl. Ex. 1 to Doc. #8.)

By letter dated October 25, 2006, Plaintiff informed Defendant that due to duplication of claims in Defendant's calculations, Defendant understated the amount it owed Plaintiff by $100,583.86. Plaintiff stated that it decided to move forward with the audit referred to by Defendant, adding that while it expected Defendant to cooperate in the audit, Plaintiff was prepared to pursue, if necessary, all available remedies with respect to Defendant's "failure to perform its obligations under the Agreement." (Pl.'s Ex. E to Doc. #1.)

Plaintiff initially filed this action in the Circuit Court of St. Louis County on March 28, 2007, but apparently never obtained formal service of process. On January 4, 2008, Plaintiff filed an amended petition.[2] In Count I of the amended petition, Plaintiff asserts that Defendant refused to honor Plaintiff's request for an audit to which Plaintiff was entitled under Section 2.10 of the CSA. In this count, Plaintiff requests an equitable audit. Count II asserts that Defendant breached the CSA by failing to remit the proper amounts for rebates and by failing to permit the audits requested by Plaintiff. Count III is based upon Defendant's alleged breach of the CSA by failing to apply the Brand Pricing Rate as agreed to in Section 4.2, and by failing to satisfy the Brand Pricing Performance Guarantee. Count IV is for unjust enrichment with regard to the rebates allegedly owed Plaintiff.

Defendant removed the case to this Court based upon diversity jurisdiction, and now, invoking the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, et seq., asks the Court to compel Plaintiff to arbitrate its claims pursuant to the arbitration agreement contained in

---

[2] The original petition was filed by Plaintiff MedScript and Unity Health Services, LLC. Only MedScript is named as a plaintiff in the amended petition.

Section 11 of the CSA. Defendant asks the Court to dismiss the action with prejudice, as all of Plaintiff's claims fall within the scope of the arbitration agreement. Without mentioning Section 7.4 of the CSA, Defendant points to the general rule that arbitration agreements are presumed to survive the termination of a contract, and to the federal policy favoring arbitration. Defendant adds that should the Court determine that not all of Plaintiff's claims are subject to the arbitration agreement, the Court should stay this action until after Plaintiff has submitted its arbitrable claims to arbitration and the arbitration process on those claims has been completed.

Plaintiff responds that despite the general rules noted by Defendant, here the arbitration agreement did not survive termination in light of the specific language of Section 7.4, stating that all obligations specified in the CSA would cease except any provision specifically referenced as surviving this agreement's termination. It is undisputed that the CSA does not expressly reference the arbitration agreement as surviving termination. Plaintiff further argues that Defendant should be estopped from arguing that Section 7.4 does not have this effect, in light of Defendant's reliance on that section in refusing to comply with the audit provision of the CSA post-termination.

In reply, Defendant argues that Section 7.4 of the CSA is not applicable because there was no "termination" of the CSA under Section 7.2; rather, the CSA was "termed" under Section 7.1, and Section 7.4 speaks in terms of "termination" of the CSA. Defendant further argues that even if Section 7.4 were applicable, its reference to "obligations" refers to performance obligation of the parties, such as claims processing and performing audits, and

not to the arbitration "provision," which is "a distinct creature separate from the parties' other obligations under the [CSA]." (Def. Reply Br. at 5.) Defendant argues that to the extent the Court finds that the CSA is ambiguous on whether Section 7.4 applies to the arbitration agreement, case law directs the Court to resolve all ambiguities in favor of arbitration.

## **DISCUSSION**

Because the CSA is "a contract evidencing a transaction involving commerce," it is subject to the FAA, which provides as follows: "A written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.." 9 U.S.C. §2. The FAA permits a party aggrieved by the refusal of another to arbitrate to petition a federal district court which has diversity of federal question jurisdiction, for an order compelling arbitration. Id. § 4; Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 26 n.32 (1983); Pro Tech Indus., Inc. v. URS Corp., 377 F.3d 868, 871 (8th Cir. 2004).

The FAA created a body of federal substantive law. Buckeye Check Cashing, Inc., 546 U.S. 440, 445 (2006). Before a district court may grant a motion to compel arbitration under 9 U.S.C. § 4, it "must engage in a limited inquiry to determine whether a valid agreement to arbitrate exists between the parties . . . ." Express Scripts, Inc. v. Aegon Direct Marketing Servs., Inc., 516 F.3d 695, 699 (8th Cir. 2008) (citing Houlihan v. Offerman & Co., Inc., 31 F.3d 692, 696 (8th Cir. 1994)). As Defendant notes, there is "a liberal federal

7

policy favoring arbitration, grounded in the FAA." Kelly v. Golden, 352 F.3d 344, 349 (8th Cir. 2003). Nevertheless, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Hudson v. ConAgra Poultry Co., 484 F.3d 496, 500 (8th Cir. 2007) (citation omitted). The federal policy in favor of arbitration "does not disregard the intent of the contracting parties as evidenced by their agreement . . . even if the result is to preclude arbitration." Keymer v. Mgmt. Recruiters Int'l, Inc., 169 F.3d 501, 504 (8th Cir. 1999). A federal court should "apply ordinary state law contract principles to decide whether parties have agreed to arbitrate a particular matter," giving "healthy regard for the federal policy favoring arbitration." AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 242 F.3d 777, 780 (8th Cir. 2001).

Under the federal common law of arbitration, there is a general presumption that an arbitration provision in a contract survives termination of the contract. In Litton Financial Printing Division, a Division of Litton Business Systems., Inc. v. NLRB, 501 U.S. 190 (1991), the Supreme Court stated as follows:

> [A]s we have found in [Nolde Bros., Inc. v. Bakery Workers, 430 U.S. 243 (1977)], structural provisions relating to remedies and dispute resolution -- for example, an arbitration provision -- may in some cases survive in order to enforce duties arising under the contract. Nolde Brothers' statement to that effect under § 301 of the [Labor Management Relations Act] is similar to the rule of contract interpretation which might apply to arbitration provisions of other commercial contracts. We presume as a matter of contract interpretation that the parties did not intend a pivotal dispute resolution provision to terminate for all purposes upon the expiration of the agreement.

8

Litton, 501 U.S. at 208 & n.3 (citing commercial cases); see also Crown Cork & Seal Co. v. Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO, 501 F.3d 912, 916 (8th Cir. 2007); Goshawk Dedicated, Ltd. v. Portsmouth Settlement Co. I, Inc., 466 F. Supp. 2d 1293, 1304 n.4 (N.D. Ga. 2006) (citing cases and secondary sources). This presumption prevails "'unless negated expressly or by clear implication.'" Id. at 204 (quoting Nolde, 430 U.S. at 255).

While recognizing the continued vitality of remedial provisions, Litton limited Nolde to apply only to a post-termination dispute that "has its real source in the contract," defined as a dispute that "involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." Id. at 205-06.

Here, Plaintiff's claims against Defendant have their "real source" in the CSA. The question presented, then, is whether by including Section 7.4 in the CSA and not specifying that the arbitration agreement would survive termination of the CSA, the parties negated "expressly or by clear implication" the presumption that the arbitration provision survived termination of the CSA. The Court first concludes that there was no express negation of the presumption. The next question, then, is whether the presumption was negated by "clear implication." Reading the CSA as a whole, see Quality Foods, Inc. v. Smithberg, 653 S.E.2d 486, 492 (Ga. Ct. App. 2007) (stating that a court should consider an entire contract

9

in arriving at the construction of any part), the Court does not believe that it clearly implies an intent to repudiate all post-termination arbitration.

The Court finds persuasive the distinction drawn by Defendant between contractual "obligations," which under Section 7.4 would not survive termination unless otherwise specified, and the agreement to arbitrate contractual disputes. The term "obligations" is used throughout the CSA in the context of the parties' responsibilities in performing the terms of the CSA while in force. And, as stated in Litton, 501 U.S. at 208, arbitration agreements in contracts are "structural provisions relating to remedies and dispute resolution," not just other contractual obligations.

Plaintiff suggests that the language of the termination provision indicates an intent by the parties that the arbitration provision not survive termination of the CSA. The Court finds, however, that a fair reading of the terms of Section 7 together with the arbitration provision suggests just the opposite. Under Section 7.2, one of the ways that "termination" may occur is in the event of a breach by either party, which is not cured after notice of same. The remedial provisions of Section 11, by their express terms, cover not only disputes arising under the CSA, but also any disputes arising out of a breach of the CSA. Section 11 provides in relevant part that "any controversy or claim arising from or relating to . . . the breach [of the CSA]," if not resolved through the Executive Committee, shall be referred to binding arbitration. Although the arbitration clause plainly states that it applies to *any* claim arising from or relating to a breach of the CSA, under Plaintiff's proffered interpretation, the remedial provisions of Section 11 would apply only to an asserted breach that did not result

10

in termination, leaving wholly unaddressed, and presumably for resolution by the courts, any claim related to a breach that resulted in a termination. But the broad language of the arbitration clause evidences no such intent to distinguish between claims of breach that result in termination verses claims of breach that do not. Indeed, the only claims arising under the CSA or the breach thereof that are excepted from the remedial provisions of Section 11 are those arising from claimed non-compliance with the non-compete covenant in Section 18. Furthermore, even if the Court were to find the contract language to be ambiguous -- and it does not so find -- the law is clear that any ambiguities are to be resolved in favor of arbitration. See Moses H. Cone, 460 U.S. at 24-25; Riley Mfg. Co. v. Anchor Glass Container Corp., 157 F.3d 775, 785 (10th Cir. 1998) (holding that ambiguity as to which claims subject to a broad arbitration clause survived a settlement agreement was to be resolved in favor or arbitrability, and was question for the court). The Court thus concludes that the arbitration agreement here survived termination of the CSA with respect to Plaintiff's claims. Cf. United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 585 (1960) ("In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad.").

Nor is Defendant estopped to invoke the arbitration clause by virtue of its assertion that the CSA does not now require Defendant to allow an audit. A fair reading of the CSA suggests that the audit provision found in Section 2.10, unlike the arbitration clause, is

11

among the performance "obligations" that cease "following the effective date of termination of [the CSA]," under Section 7.4.[3] As the Court agrees with Defendant's position that the arbitration agreement is distinct from any performance "obligations" that cease with the termination of the Agreement, it follows that no estoppel to enforce the arbitration clause arises from any refusal on Defendant's part to permit an audit.

Because all of Plaintiff's claims are subject to arbitration, the Court may dismiss this matter rather than stay it and compel arbitration. See Alford v. Dean Witter Reynolds, Inc., 975 F.2d 1161, 1164 (5th Cir. 1992) ("The weight of authority clearly supports dismissal of the case when all of the issues raised in the district court must be submitted to arbitration.") (collecting cases); Kalinski v. Robert W. Baird & Co., 184 F. Supp. 2d 944, 946-47 (D. Neb. 2002); see also Green Tree Financial Corp.-Al. v. Randolph, 531 U.S. 79 (discussing appealability of district court's order that granted motion to compel arbitration and dismissed suit with prejudice); Barker v. Golf U.S.A., Inc., 154 F.3d 788, 793 (8th Cir. 1998) (affirming dismissal because of valid arbitration clause). Plaintiff has presented no reasons why dismissal would be inappropriate as contrasted with compelling arbitration and staying the case, and the Court detects none.

---

[3] Whether Plaintiff is entitled to receive an audit following expiration of the term of the CSA, however, is ultimately for the arbitrators to decide.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the motion of Defendant ProCare PBM, Inc., to compel arbitration is **GRANTED**. [Doc. #4]

A separate Order of Dismissal shall accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 17th day of November, 2008.